OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | |
| | : | No. 89-1001 |
| of | : | |
| | : | MAY 8, 1990 |
| JOHN K. VAN DE KAMP | : | |
| Attorney General | : | |
| | : | |
| RONALD M. WEISKOPF | : | |
| Deputy Attorney General | : | |
| | : | |

_____


THE HONORABLE WILLIAM MEDIGOVICH, DIRECTOR, OFFICE OF EMERGENCY SERVICES has requested an opinion on the following question:

How will the decommissioning of the Rancho Seco nuclear powerplant affect the contribution that is made under Government Code section 8610.5 by the Sacramento Municipal Utility District and other utilities with nuclear powerplants for reimbursement of State and local agency costs for nuclear powerplant emergency planning and preparedness?


CONCLUSION

The decommissioning of the Rancho Seco nuclear powerplant will not affect the contribution that is made under Government Code section 8610.5 by the Sacramento Municipal Utility District and other utilities with nuclear powerplants to reimburse State and local agency costs for nuclear powerplant emergency planning and preparedness until the federal Nuclear Regulatory Commission determines that such preparedness is no longer necessary in connection with the Rancho Seco facility. Thereafter, the Sacramento Municipal Utility District will no longer be responsible for contribution under the section and the remaining two utilities with nuclear powerplants in California will share equally in reimbursing the overall State costs for nuclear powerplant emergency preparedness under the section. Those utilities will also remain individually responsible for reimbursing the particular local costs of preparedness occasioned by their individual facilities.

ANALYSIS

Under section 8610.5 of the Government Code, the costs incurred by State and local agencies in carrying out nuclear powerplant emergency planning and preparedness, that are not reimbursed with federal funds, is borne by "utilities with existing nuclear powerplants having a generating capacity of 50 megawatts or more."  (§ 8610.5.) [1]  The Office of Emergency Services notifies each such utility of the amount of its share of those costs and the utility must then pay that amount to the Controller for deposit into the Nuclear Planning Assessment Special Account in the State General Fund.  ( *Ibid.*)  The appropriate State and local agency costs are then paid from the Account by the Controller upon certification by the Office of Emergency Services.  (*Ibid.*)

The Sacramento Municipal Utility District ["SMUD"], permanently ceased power operation at its Rancho Seco nuclear facility on June 7, 1989, and defueling of the reactor was completed on December 8, 1989.  (See, 55 Fed.Reg. 7394 (Mar. 1, 1990).)  The nuclear fuel removed from the reactor core is currently being stored at the site in a "spent fuel pool." "Defueling is the last major action associated with an operating reactor." ( *Ibid.*)  SMUD will now be initiating steps to "decommission" Rancho Seco, i.e., steps to remove it safely from service as a commercial producer of electricity and to reduce the residual radioactivity at the site to a level that will permit release of the property for unrestricted use.  (Cf., 10 CFR § 50.2.)

We are asked how the decommissioning of Rancho Seco will affect the contributions that SMUD and other utilities with nuclear powerplants make to the Nuclear Planning Assessment Special Account under section 8610.5.  We conclude that until such time as the federal Nuclear Regulatory Commission determines that it is no longer necessary for the Sacramento Municipal Utility District to maintain emergency preparedness in connection with the Rancho Seco facility, SMUD will continue to be responsible for its appropriate share of State and local agency costs under the section.  However, when the Nuclear Regulatory Commission does determine that emergency preparedness is no longer necessary, the remaining State agency costs for nuclear powerplant emergency preparedness (no longer including preparedness efforts for Rancho Seco) will be shared equally by the two utilities continuing to operate nuclear powerplants in California with a generating capacity of 50 megawatts or more.  Those utilities will also remain responsible for the costs of local agency emergency preparedness efforts associated with their individual facilities.

---

[1]Section 8610.5 is set forth in full as Appendix A to this Opinion.

Government Code section 8610.5 (Stats. 1979, ch. 956, § 1) was enacted in response to the incident at the Three Mile Island nuclear powerplant at Harrisburg, Pennsylvania on March 28, 1979. (See Selected 1979 California Legislation: Energy; Nuclear Power Plant Emergency Procedures (1979-80) 11 Pac. L.J. 515, 515.) After the incident, the Legislature held hearings on the ability of our State and local agencies to respond to emergencies at nuclear powerplants (*id.* at 515 fn. 1) and thereafter enacted the section to compel a study of the consequences of a serious nuclear powerplant accident in California, with the aim of having the State Nuclear Powerplant Emergency Response Plan, and local emergency response plans, revised and upgraded accordingly.[2]

More particularly, it required the Office of Emergency Services ["OES"], in consultation with the State Department of Health Services and affected counties, to (i) "investigate the consequences of a serious nuclear powerplant accident for each of the four nuclear powerplants in California with a generating capacity of 50 megawatts or more" and, on conclusion of the study, (ii) to revise its Nuclear Powerplant Emergency Response Plan to reflect the information provided in it, and (iii) assist local authorities prepare or upgrade their emergency response plans to reflect the study's new planning guidelines. (§ 8610.5 as added by Stats. 1979, ch. 956, § 1, *supra.*) The section also expressed the intention of the Legislature that all State and local costs related to carrying out its provisions, not reimbursed by federal funds, "be borne by the operators of the four existing nuclear powerplants having a generating capacity of 50 megawatts or more...." (*Ibid.*) The Nuclear Planning Assessment Special Account was created in the General Fund as the vehicle for that cost reimbursement.

In 1988, following the incident at the Chernobyl nuclear reactor in the Ukraine, the California Legislature adopted the Radiation Protection Act of 1988. (Stats. 1988, ch. 1607, § 4, adding ch. 6.99 (§ 25572 et seq.) to div. 20 of the Health & Saf. Code.)[3] Basically, that Act required the State Department of

---

[2]After the Three Mile Island incident, the federal Nuclear Regulatory Commission also revised and updated its regulations relating to required emergency planning and preparedness. (See Emergency Planning, 45 Fed.Reg. 55402 (Aug. 19, 1980).)

[3]The legislation followed the recommendations of a Task Force on California Nuclear Emergency Response, which had been established in 1986 (Sen.Res. 48) to "formulate a report on the State['s] ... medical and emergency response capacity in the event of a major nuclear facility accident...." (Stats. 1988, ch. 1607, § 3.) "In 1987, the task force reviewed emergency response plans for the State's nuclear power facilities, heard testimony at public hearings held near each of the State's ... nuclear power facilities, and reviewed data emerging from the Chernobyl nuclear

Health Services and the Office of Emergency Services to undertake certain responsibilities to ensure that an adequate response by State and local agencies could be made in the event of a nuclear powerplant accident. (Health & Saf. Code, §§ 25574, 25582.)[4] The same legislation which enacted the Radiation Protection Act also amended section 8610.5 of the Government Code to provide for the reimbursement of State and local costs relative to carrying out the Act's provisions from the Nuclear Planning Assessment Special Account. (Gov. Code, § 8610.5 as amended by Stats. 1988, ch. 1607, §§ 1, 5; cf., Health & Saf. Code, § 25582, subd. (b).)

Section 8610.5 thus presently requires State and local agency costs that are incurred in implementing both its provisions as well as those of the Radiation Protection Act, which are not

---

accident." (*Ibid.*)

[4]The Act required the Department of Health Services to (a) develop additional communication systems for quick dissemination of emergency response information in the event of a nuclear power plant emergency; (b) to establish a radiation emergency screening team --composed of three individuals with expertise in medicine, radiation biology, radiation casualty management, emergency preparedness and disaster response, and public health, who would be available for immediate travel to the scene of a major radiation accident where they would have responsibility of assisting other emergency response agencies or persons in making decisions regarding initial patient management and casualty evacuation; (c) to designate special medical facilities for the management and treatment of casualties of a nuclear powerplant accident; (d) to undertake certain functions in the Ingestion Pathway Zone; and (e) to ensure, in coordination with affected counties and the Office of Emergency Services, that ingestion pathway and recovery/reentry systems were developed and ready to be implemented, with adequate training of personnel. (Health & Saf. Code, § 25574.)

The Office of Emergency Services was given the duties of: (a) notifying counties adjacent to an Emergency Planning Zone of the details of a nuclear powerplant emergency; (b) exercising ultimate authority for the allocation of funds from the Nuclear Planning Assessment Special Account to local jurisdictions for nuclear powerplant emergency planning and response activities; (c) ensuring a primary and backup communications capability with county emergency operations centers in the Emergency Planning Zones; (d) participating annually in exercises of the State's nuclear emergency response plan to ensure that State personnel are adequately trained to respond in the event of an actual emergency; and (e) cooperating with local emergency response authorities and utilities operating nuclear power facilities to ensure the adequacy of their primary and backup communications systems. (Health & Saf. Code, § 25582.)

reimbursed with federal funds, to be reimbursed from the Nuclear Planning Assessment Special Account. As mentioned at the outset, that Account is funded by utilities operating nuclear powerplants having a generating capacity of 50 megawatts or more. But as also mentioned, the Rancho Seco nuclear facility is no longer generating electricity and SMUD will be taking steps to have it decommissioned. Question therefore arises of whether, or for how long, SMUD must continue to contribute its portion to the Nuclear Planning Assessment Special Account under section 8610.5.

In answering that question our primary task is to ascertain the intention of the Legislature so as to effectuate the purpose of the law. (Cf., *Sand* v. *Superior Court* (1983) 34 Cal.3d 567, 570; *Great Lake Properties, Inc* v. *City of El Segundo* (1977) 19 Cal.3d 152, 153; *Select Base Materials* v. *Board of Equalization* (1959) 51 Cal.2d 640, 645; *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688.) Thus, under circumstances of decommissioning, would the Legislature have intended a utility to continue to pay into the Nuclear Planning Assessment Special Account under section 8610.5, and if so, for how long?

To ascertain that intention we turn first to the words of the statute. (Cf., *Sand* v. *Superior Court*, *supra*, 34 Cal.3d 567, 570; *Moyer* v. *Workmen's Compensation Appeals Board* (1973) 10 Cal.3d 222, 230; *Steilberg* v. *Lackner* (1977) 69 Cal.App.3d 780, 785; *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 604.) Section 8610.5 is lengthy and its present composition is an accretion of additions made over the past decade. In quoting the relevant portion of it here we have numbered the sentences to facilitate referring to them in analyzing the section. Section 8610.5 currently provides in pertinent part as follows:

"**[1]**It is the intent of the Legislature that state and local costs related to carrying out the provisions of this section which are not reimbursed by federal funds shall be borne by the utility [sic] with existing nuclear powerplants having a generating capacity of 50 megawatts or more. **[2]**The Public Utilities Commission shall develop and transmit to the Office of Emergency Services an equitable method of assessing the utilities operating the powerplants for their reasonable pro rata share of state agency costs. **[3]**Each local agency involved shall submit a statement of its costs in such manner as the Office of Emergency Services shall require. **[4]**Upon each utility's notification by the Office of Emergency Services, from time to time, of the amount of its share of the actual or anticipated state and local agency costs, the utility shall pay such amount to the Controller for deposit in the Nuclear Planning Assessment Special Account, which is hereby created in the General Fund for use by the Controller, upon appropriation by the

Legislature, to carry out this section, and, upon appropriation by the Legislature, to carry out the purposes of Chapter 6.99 (commencing with Section 25572 of Division 20 of the Health and Safety Code. **[5]**The Controller shall pay from this account the state and local costs relative to carrying out the provisions of this section and Chapter 6.99 (commencing with Section 25572) of Division 20 of the Health and Safety Code, upon certification thereof by the Office of Emergency Services. **[6]**Each utility operating a nuclear powerplant shall, within one month of the effective date of this section, pay to the Controller for deposit into the Nuclear Planning Assessment Special Account the sum of twenty-five thousand dollars ($25,000) for each nuclear powerplant for the purpose of funding initial planning costs. **[7]**Upon repeal of this section, any amounts remaining in the special account shall be refunded pro rata to the utilities contributing thereto. **[8]**Commencing on the effective date of the amendment of this section during the 1988 portion of the 1987-88 Regular Session of the Legislature, the total annual reimbursement of state costs from the utilities operating the nuclear powerplants within the state pursuant to this section shall not exceed the lesser of the actual costs or nine hundred thirty-seven thousand dollars ($937,000) annually to be shared equally among the utilities. **[9]**Commencing on January 1, 1989, the total annual reimbursement of local costs from privately owned utilities shall not exceed the lesser of the actual costs or two hundred fifty thousand dollars ($250,000) per reactor unit annually and from publicly owned utilities shall not exceed the lesser of the actual costs or four hundred fifty thousand dollars ($450,000) per reactor unit annually. **[10]**Of the nine hundred thirty-seven thousand dollars ($937,000) for state costs, three hundred seventy-five thousand dollars ($375,000) are in support of an annual interagency agreement between the Office of Emergency Services and the State Department of Health Services for activities of the department pursuant to this section and Chapter 6.99 (commencing with Section 25572) of Division 20 of the Health and Safety Code, three hundred thousand dollars ($300,000) are in support of the Office of Emergency Services for activities pursuant to this section and two hundred sixty-two thousand dollars ($262,000) are in support of the Office of Emergency Services for activities pursuant to Chapter 6.99 (commencing with Section 25572) of Division 20 of the Health and Safety Code. **[11]**Of the two hundred fifty thousand dollars ($250,000) per reactor unit annually for local costs, paid by privately owned utilities, up to one hundred fifty thousand dollars ($150,000) per reactor

unit are in support of activities pursuant to this section and up to one hundred thousand dollars ($100,000) per reactor unit are in support of local activities pursuant to Chapter 6.99 (commencing with Section 25572) of Division 20 of the Health and Safety Code. **[12]** The amounts paid by privately owned utilities under this section shall be allowed for ratemaking purposes by the Public Utilities Commission. Publicly owned public utilities may include amounts paid under this section in their rates.

"The amounts specified in this section shall be adjusted each fiscal year by the percentage increase in the California Consumer Price Index for the previous calendar year." (§ 8610.5; Stats. 1979, ch. 965, p. 3296, § 1 as amended by Stats. 1982, c. 864, p. 3215, § 1, eff. Sept. 10, 1982; Stats. 1986, c. 722, p. 2401, § 1; Stats. 1987, c. 450, p. ___, § 1, eff. Sept. 8, 1987; Stats. 1988, c. 1607, p. ___, § 1; emphases added.)

Needless to say, the section is complex and so before examining the actual language to determine exactly which utilities must make payments to the Nuclear Planning Assessment Special Account to reimburse State and local agencies for their activities in nuclear powerplant emergency planning and preparedness, it is best that we provide a synopsis to better understand the mechanism of the section.

The portion of the section we have quoted commences with a clearly stated legislative intention that State and local costs related to carrying out its provisions, not reimbursed with federal funds, be borne by utilities "with existing nuclear powerplants having a generating capacity of 50 megawatts or more". (§ 8610.5, [1].) Local agencies submit their individual costs for emergency preparedness to the Office of Emergency Services (*id.*, [3]), while the overall State costs are shared equally among "utilities operating the nuclear powerplants within the state" (*id.*, [8]). The Office of Emergency Services notifies "each utility" of the amount of its share of the actual or anticipated State and local agency costs (*id.*, [4]), and "the utility" must pay that amount to the Controller for deposit into the Nuclear Planning Assessment Special Account (*ibid.*). The Controller then pays the State and local costs relative to carrying out the provisions of section 8610.5 as well as those of the Radiation Protection Act from that Account. (*Id.*, [5], [10], [11].)

Under the section's present direction, the total annual reimbursement of <u>State costs</u> incurred in connection with nuclear powerplant emergency preparedness, not reimbursed with federal funds and capped at $935,000, is shared equally among all utilities

"operating nuclear powerplants" in California.[5] (*Id.*, [8].) [Up to $375,000 of that amount is used in support of the annual interagency agreement between the Office of Emergency Services and the State Department of Health Services for activities of the Department under section 8610.5 and the Radiation Protection Act; up to $300,000 is used for OES activities under section 8610.5, and up to $262,000 is used for OES activities under the Radiation Protection Act. (*Id.*, [10].)] The total annual reimbursement of local costs from "privately owned utilities" (not reimbursed with federal funds) is the lesser of the actual costs or $250,000 "per reactor unit." (*Id.*, [9].) [Up to $150,000 per reactor unit of that amount is used in support of local activities pursuant to section 8610.5 and up to $100,000 per reactor unit is used in support of local activities pursuant to the Radiation Protection Act. (*id.*, [11].)] The total annual reimbursement of local costs from "publicly owned utilities" (not reimbursed with federal funds) is the lesser of the actual costs or $450,000 "per reactor unit." (*Id.*, [9].) [No specific allocation of that amount is made to cap cost reimbursement for activities undertaken by local agencies pursuant to section 8610.5 and activities undertaken pursuant to the Radiation Protection Act.] The amounts paid by utilities under the section can be passed on to the consumer in the utilities' rates. (*Id.*, [12].)

With the overall working of section 8610.5 thus in mind we can turn to its actual language to discern the operative words which determine which utilities must reimburse State and local costs for emergency planning and preparedness associated with nuclear powerplants.

Sentence #1 of the section (as quoted above) expresses the Legislature's intention that the State and local costs incurred in implementing its provisions (which now also include implementation of the provisions of the Radiation Protection Act (sent. #s 4, 5, 10, 11) should be borne by "the utility [sic, utilities] with existing nuclear powerplants having a generating capacity of 50 megawatts or more." We perceive this to be a general expression of legislative intent to guide the interpretation of the more specific provisions which follow.

---

[5]Formerly State costs were "prorated among utilities in proportion to the allocation of benefit to each plant", with the Public Utilities Commission "develop[ing] and transmit[ting] to the Office of Emergency Services an equitable method of assessing ... their reasonable prorata share...." (§ 8610.5 as amended by Stats. 1982, ch. 864, § 1, p. 3216.) However, in 1987 section 8610.5 was amended to provide that the State costs "be shared equally among the utilities...." (Stats. 1987, ch. 450, p. ___, § 1.) We note that the former rôle of the PUC is still mentioned in the section. (§ 8610.5, [2].)

Sentence #4 is the main operative sentence that imposes the requirement on utilities to reimburse those emergency preparedness costs:  "Upon each utility's notification by the Office of Emergency Services, from time to time, of the amount of its share of the actual or anticipated state and local agency costs, the utility shall pay such amount to the Controller...." The interpretative problem posed is what the word "utility" means in the emphasized part of the quotation.  Clearly it refers back to the beginning of the sentence to "each utility's notification by the [OES]" but that does not help define exactly which utilities in California the OES is required to notify.  We must look elsewhere for the answer to that.

The legislative intent expressed in sentence #1 indicates that it is only those utilities "with existing nuclear powerplants having a generating capacity of 50 megawatts or more" that are required to reimburse State and local costs under section 8610.5.  But, might any other provisions of the section suggest a further qualification or limitation on the utilities which must make that reimbursement?  Examining the other provisions of section 8610.5, we can find one - a utility must be "operating" such a plant.

Sentence #6 dates from the original enactment of the section when it required "each powerplant operator" to pay $25,000 to the Controller within one month of the effective date of the section [September 22, 1979] to fund initial emergency planning under it.  (Stats. 1979, ch. 965, § 1, *supra*.)  The sentence was amended in 1982 to require "each utility operating a nuclear powerplant" to pay that amount.  (Stats. 1982, ch. 864, § 1, *supra*.)  Since the requirement was imposed only to secure "seed money" for initial planning under the section, the qualification that only "utilit[ies] operating a nuclear powerplant" (or "powerplant operator[s]") make those initial payments would not literally apply to other payments that they make must under the section.  But we can think of no logical reason why the Legislature would have had reimbursement for initial planning costs apply to a different category of utilities (or "operators") than those who would reimburse subsequent costs.  It would thus appear that those costs as well should come from utilities "operating a nuclear powerplant", or "powerplant operator[s]".

Indeed, that qualification is expressed in sentence #8. That sentence caps the reimbursement that utilities must make of state agency costs under section 8610.5, and indicates that the reimbursement is to come "from the utilities operating the nuclear powerplants within the state."  However, it should be pointed out that sentence #9, which caps utilities' reimbursement of local costs, designates the utilities which must make that reimbursement only by the words "privately owned" and "publicly owned", and mentions nothing about utilities "operating nuclear powerplants." While it might thus be argued that the absence of the word "operating" in sentence #9 was meant to signify that the

legislature also intended that local costs for emergency planning were to be reimbursed by utilities which were not "operating" nuclear powerplants as well as those which were, we reject the argument. There is nothing else in the statute to suggest that the Legislature wished to make a distinction between those utilities which would have to reimburse State agency costs and those which would have to reimburse local agency costs, and we can think of no logical reason why one would have been made.

We therefore conclude that the Legislature intended to have the requirement to contribute toward reimbursement of State and local agency costs under section 8610.5 apply to all utilities "with existing nuclear powerplants having a generating capacity of 50 megawatts or more" which were "operating" such plants in this State.

SMUD is a publicly owned utility. As long as it is "operating" an "existing nuclear powerplant with a generating capacity of 50 megawatts or more", it is responsible under section 8610.5 for payment of an equal share with other utilities "operating nuclear powerplants" to reimburse State agency costs associated with implementing section 8610.5 and the Radiation Protection Act, and an amount up to $450,000 to reimburse local agency costs particularly associated with Rancho Seco.

Is Rancho Seco then, which is no longer producing electricity, an "existing nuclear powerplant with a generating capacity of 50 megawatts or more" and is SMUD now "operating a nuclear powerplant" within the meaning of section 8610.5? And if those answers are affirmative, will they change, and if so how, with the decommissioning of the facility?

Usually a statute is interpreted according to the usual, ordinary, and generally accepted meaning of the words used to frame it. (Cf., *People* v. *Craft* (1986) 41 Cal.3d 554, 560; *People* v. *Castro* (1985) 38 Cal.3d 301, 310; *People* v. *Belleci* (1979) 24 Cal.3d 879, 884; *Palos Verdes Faculty Assn* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658; *Great Lakes Properties Inc.* v. *City of El Segundo*, *supra*, 19 Cal.3d 152, 155-156.) But the words must "be read in context, keeping mind the nature and obvious purpose of the statute [citation], and the statutory language applied must be given such interpretation as will promote rather than defeat the objective and policy of the law." (*Steilberg* v. *Lackner*, *supra*, 69 Cal.App.3d 780, 785; see also, *Great Lakes Properties, Inc.* v. *City of El Segundo*, *supra* at 155-156 [where the legislative history of the subject matter imports a different meaning, literal language will not be followed]; *Alford* v. *Pierno*, *supra*, 27 Cal.App.3d 682, 688 [the purpose of a statute will not be sacrificed to a literal construction].)

It is somewhat ambiguous from the literal wording of section 8610.5 whether the section requires that a powerplant be fully operational and actually producing electricity in order for it to be considered an "existing nuclear powerplant with a capacity of 50 megawatts or more" [6], or for the utility involved to be considered one which is "operating a nuclear powerplant". But the historical circumstances attending the enactment of the section make it clear that such a condition was not intended for the section to apply. (Cf., *California Mfgrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844; *Sand* v. *Superior Court*, *supra*, 34 Cal.3d 567, 570; *People* v. *Ventura Refining Co.* (1928) 204 Cal. 286, 291; *Steilberg* v. *Lackner*, *supra*, 69 Cal.App.3d 780, 785; *Alford* v. *Pierno*, *supra*, 27 Cal.App.3d 682, 688.)

When section 8610.5 was first enacted in 1979 the Legislature expressed its intention that all State and local costs related to carrying out its provisions, not reimbursed by federal funds, should "be borne by the operators of <u>the four existing nuclear powerplants</u> having a generating capacity of 50 megawatts or more...." (Stats. 1979, ch. 956, § 1, *supra*; emphasis added.) At the time, however, there were <u>only three</u> commercial nuclear reactor units in California that had been completed and issued licenses to operate (Humboldt Bay, San Onofre Unit #1, and Rancho Seco) and of those three, <u>only two</u> (San Onofre Unit #1 and Rancho Seco) were actually operating and producing electricity.[7] (See Appendix B.) Therefore, when the Legislature spoke of "the operators of the four existing nuclear powerplants having a generating capacity of 50 megawatts or more" it must have had something other in mind than utilities running fully operational nuclear facilities that were actually producing electricity.

This perception is confirmed by the fact that in 1980, the Legislature enacted a special statute, Health and Safety Code section 25880.4, to exempt the nuclear facility at Humboldt Bay --

---

[6]The word "existing" means having "actual or real being." (Webster's <u>Third New Intn'l. Dict.</u> (1971 ed.) at p. 796.) However, in section 8610.5 it is used to modify "nuclear powerplant" and not "capacity". "Capacity" means an "ability to process, ... produce ..., or yield". (*Id.* at p. 330.) The structure of the section thus seems to indicate that the ability to produce electric power need not be current in order for an existing nuclear powerplant to come within its embrace.

[7]Although the nuclear facility at Humboldt Bay had been issued a provisional operating license in 1962 and a full term 40-year license in 1969, it was shut down by order of the Nuclear Regulatory Commission in 1976 for plant modifications to accommodate seismic concerns (cf., Health & Saf. Code, § 25880.4) and it never entered service again as a commercial producer of electricity.

which had been shut down four years earlier and was no longer producing electricity (cf., fn. 7, *ante*)-- from need for local planning under section 8610.5.[8] The fact that the Legislature felt that a special statute was necessary to exempt the facility from those planning requirements indicates that it thought that Humboldt Bay, though not producing electricity, would nonetheless be considered to be an "existing nuclear powerplant with a generating capacity of 50 megawatts or more" within the purview of the section and thus occasion a need for local emergency powerplant planning under it. (Cf., *Safer* v. *Superior Court* (1975) 15 Cal.3d 230, 236, 238; *Santa Fe Transp.* v. *State Board of Equal.* (1959) 51 Cal.2d 531, 538-539; *Board of Trustees* v. *Judge* (1975) 50 Cal.App.3d 920, 927.)

What then did the Legislature have in mind when it spoke of "four existing nuclear powerplants"? We believe it thought of the four locales in California which were to soon host nuclear facilities and which, because of them, would require planning for emergency preparedness. Specifically, although there were only two nuclear facilities actually producing electricity in California in 1979, there were four additional units well into construction, each of which would eventually produce 50 megawatts or more of electricity --San Onofre Units 2 & 3 and Diablo Canyon Units 1 & 2. (Cf., Appendix B.) Thus, when the Legislature enacted section 8610.5 in 1979, there were four existing sites where nuclear power would be employed for the commercial production of electricity and where State and local emergency preparedness would be necessary: Humboldt Bay, Rancho Seco, Diablo Canyon and San Onofre. When the Legislature spoke of "the four existing nuclear powerplants having a generating capacity of 50 megawatts or more" we believe it had those four sites in mind which would require the type of emergency planning and preparedness that section 8610.5 speaks to.[9]

---

[8]Section 25880.4 provided: " If the Humboldt Bay Nuclear Generating Station is not in operation on the effective date of this section [September 26, 1980], the local emergency plan for it shall not be required to meet the revised emergency response plan requirements of Section 8610.5 of the Government Code until the Nuclear Regulatory Commission determines that the powerplant meets [NRC] seismic safety criteria, or until the [NRC] issues an order rescinding the restrictions imposed on the [facility] in its order of May 21, 1976. [¶]In the event the [NRC] determines that the ... Station meets [NRC] seismic safety standards, or issues an order rescinding the restrictions,... a ... county emergency plan meeting the requirements of Section 8610.5 ... shall be submitted to the Office of Emergency Services...." (Emphasis added.)

[9]The distinction between a "nuclear powerplant" and an individual "reactor unit" is seen in section 8610.5 as it appears today. Sentence #1 of the section still speaks of "nuclear powerplants having a generating capacity of 50 megawatts or more",

But again, only two reactor units were actually producing electricity at those four sites. We therefore do not read the expression of legislative intent for State and local costs related to carrying out the provisions of section 8610.5 to be borne by utilities with "existing nuclear powerplants having a generating capacity of 50 megawatts or more", to look to whether a particular facility is actually producing electricity.[10] A utility "operating" a nuclear powerplant might still be liable for contribution under the section even though its facility is not fully operational and actually producing electricity.

---

but when sentence #9 comes to describe the reimbursement of local costs from private and public utilities, it does so by "reactor unit." Ordinarily "when different language is used in ... different parts of a statute it is presumed the legislature intended a different meaning [for them]...." ( *People* v. *Moore* (1986) 178 Cal.App.3d 898, 903; see also, *In re Karpf* (1970) 10 Cal.App.3d 355, 365; *Charles S.* v. *Board of Education* (1971) 20 Cal.App.3d 83, 95; 64 Ops.Cal.Atty.Gen. 455, 458 (1981).)

[10]In 1982 section 8610.5 was amended to have the designated bearers of costs changed to read as it does today: costs are to be borne by "the utility [sic, utilities] with existing nuclear powerplants having a generating capacity of 50 megawatts or more...." (Stats. 1982, ch. 864, § 1, *supra*.) We see no significance in the change that was made from "operators" to "utilities". Indeed, the Legislative Counsel's Digest of the Bill which made the amendment indicates that the change was to "clarify existing law." (6 Stats. 1982, Sum.Dig. [SB 1473], p. 285.) Then, while the former wording "four existing nuclear powerplants with a generating capacity of 50 megawatts or more" may have been amended to delete the word "four", the phrase still spoke of "nuclear powerplants" and there was no indication that the notion of what was to be considered a "nuclear powerplant" was meant to change. To the contrary, the aforementioned Legislative Counsel's Digest speaks of "4 nuclear powerplants within the state" (*id.* at p. 284) while at the time still only two nuclear facilities were operating to produce electricity (cf., Appendix B). Since "it is reasonable to presume that the Legislature amended section [8610.5] with the ... meaning expressed in the Legislative Counsel's digest [Citations]" (*People* v. *Martinez* (1987) 194 Cal.App.3d 15, 22) it would appear that a "nuclear powerplant" would still be a site where emergency preparedness would be necessary because of the presence of a nuclear facility, whether or not it was actually producing electricity. In this vein it is observed that it is not necessary for a nuclear powerplant to be producing electricity in order for emergency planning to be necessary in connection with it. Indeed, the rules of the Nuclear Regulatory Commission contemplate some degree of onsite and offsite emergency planning even at the construction stage of a facility. (10 CFR § 50.34(a)(10) & Pt. 50, App. E, II (The Preliminary Safety Analysis Report).)

What then does determine when a utility is obligated to contribute to cost reimbursement under section 8610.5? The answer, we believe, is found in the purpose for which the section was enacted: to secure reimbursement for the costs of State and local nuclear powerplant emergency planning and preparedness from those utilities operating facilities making such State and local efforts necessary. And so, while it may belabor the obvious, we will briefly discuss why State and local nuclear emergency planning and preparedness is occasioned by a nuclear facility.

The Atomic Energy Act of 1954 (Pub.L. 83-703), as amended, vests the Nuclear Regulatory Commission ["NRC"] with authority to regulate the construction and operation of commercial nuclear powerplants in the United States through a system of licensing "subject to such conditions as the Commission may by rule or regulation establish...." (42 U.S.C.A. § 2133(a);*Power Reactor Development Co* v. *International Union of Electrical Radio Machine Workers* (1961) 367 U.S. 396, 404.)[11,12] Under the Act and the rules and regulations of the Commission, no person may construct or operate a nuclear power facility (i.e., a "utilization facility for industrial or commercial purposes") without a license from the Commission to do so. (42 U.S.C.A. §§ 2131, 2132, 2133, 2136, 2137; 10 CFR, Part 50, §§ 50.10, 50.22, 50.23, 50.50.)[13]

An operating license may not be issued unless the NRC can make a favorable finding that the integration of onsite and offsite emergency planning taken together provides "reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency." (10 CFR § 50.47(a)(1); cf., Emergency Planning, 45 Fed.Reg. 55402, 55403 (Aug. 19, 1980).) This involves an evaluation of the emergency response plans not only of the licensee, but also of State and local agencies that may

---

[11]The Atomic Energy Act of 1954, as amended, appears in Title 42 of West's United States Code Annotated, i.e., 42 United States Code Annotated, section 2011 et seq. References to the Act in this opinion will be to that reference.

[12]The licensing and related regulatory oversight functions for commercial nuclear powered plants were originally vested in the Atomic Energy Commission. In 1974 Congress enacted the Energy Reorganization Act (Pub.L. 93-438; 42 U.S.C.A. § 5801 et seq.) which abolished that Commission and transferred all the licensing and related regulatory functions assigned to it under the Atomic Energy Act of 1954 to a newly created Nuclear Regulatory Commission. (42 U.S.C. § 5841.) The Energy Reorganization Act became effective on January 15, 1975. (Ex.Order 11834.)

[13]The rules and regulations of the Nuclear Regulatory Commission ["NRC" or "Commission"] are contained in Title 10 of the Code of Federal Regulations.

be involved in dealing with an emergency at the facility.  (10 CFR §§ 50.47(a),(b); 50.54(s)(1),(2); & Pt. 50, App. E.)  Thus, the NRC bases its determination of whether to issue an operating license for a nuclear powerplant in part on whether State and local agency plans for dealing with a radiological emergency at the facility are adequate and whether they can be implemented.  (10 CFR § 50.47(a)(2); cf. § 50.54(s)(3).)

Onsite and offsite emergency response plans, including those of the affected State(s) and local agencies, must meet certain standards and criteria.  (10 CFR §§ 50.47(b), 50.54(q),(s),(u), & Pt. 50, App. E; see also 44 CFR § 350.5 [FEMA]; Emergency Planning, *supra*, 45 Fed.Reg. 55402, 55403-55406.)  Whether specifically stated in a license or not, the need to meet those standards is deemed a continuing condition of every operating license (10 CFR § 50.54) and must be maintained throughout its term (*id.*, subsec. (q)).

Two federal agencies assess the adequacy of State and local emergency preparedness, the Nuclear Regulatory Commission and the Federal Emergency Management Agency ["FEMA"].  On January 14, 1980, they signed a Memorandum of Understanding describing the responsibilities of each in radiological emergency preparedness.  (See 45 Fed.Reg. 5847 (Jan. 24, 1980).)  Under the Agreement, FEMA has responsibility for assessing off-site emergency planning, including assessing and determining whether State and local emergency plans are adequate and capable of implementation.  FEMA also assumes responsibility for emergency preparedness training of State and local officials.  (45 Fed.Reg. 5847, 5848-5849, *supra*; see also, 44 CFR, Part 350.)  The NRC, on the other hand, has primary responsibility for assessing the adequacy of the emergency preparedness of its licensees.  (45 Fed.Reg., *supra* at pp. 5848-5849.)  However, in a licensing proceeding, such as one to issue or continue an operating license, the NRC makes the final determination as to the overall state of emergency preparedness, i.e., the integrated coordination of the licensee's emergency preparedness and that of the State and local governments concerned.  (*Ibid.*; cf., 10 CFR §§ 50.47(a)(1),(2), 50.54(s)(3); see also Emergency Planning, *supra*, 45 Fed.Reg. at pp. 55403, 55406.)

The NRC and FEMA have jointly issued a document entitled "Criteria for Preparation and Evaluation of Radiological Emergency Response Plans and Preparedness in Support of Nuclear Power Plants" (NUREG-0654/FEMA-REP-1) to provide guidance to licensees and to State and local governments in radiological emergency preparedness.  (See, Emergency Planning, *supra*, 45 Fed.Reg. at p. 55403; see also, 45 Fed.Reg. 42342 (June 24, 1980).)  The document contains a series of specific criteria for preparing and evaluating the planning and preparedness activities of State and local governments, as well as those of the licensees of the NRC, and it sets forth the standards and criteria that will be used in determining the adequacy of their

emergency response plans.  (*Ibid.*; see also, 44 CFR § 350.5; 10 CFR § 50.47(b).)

Among the joint criteria and standards that are set forth which involve State and local agencies in emergency planning are the following:  the assignment of primary responsibilities for emergency response by State and local organizations within the Emergency Planning Zones[14]; the development of appropriate protective actions to be taken in the Emergency Planning Zones; the coordination of various onsite response activities and offsite support and response activities, including those of governmental agencies; and the conduct of periodic exercises and drills with "full participation" by appropriate State and local agencies[15].  (10 CFR § 50.47(b) & Pt. 50, App. E, § IV; 44 CFR § 350.5.)

From this overview we see (i) how the federal statutory scheme governing the licensing of nuclear powerplants contemplates the existence of State and local emergency preparedness as part of providing an effective response to a potential incident at a nuclear powerplant, and (ii) how that preparedness in turn involves the active participation by State and local agencies in emergency planning and training so they will be able to make that effective response.

_____

[14]The Emergency Planning Zone (EPZ) concept is at the heart of federal emergency planning policy. (See, *Emergency Planning*, 45 Fed.Reg. 55402, 55406 (Aug. 19, 1980.)  Two EPZ's are established around each light water reactor --a plume/airborne/inhalation exposure pathway with a radius of about 10 miles, and an ingestion pathway (for contaminated food and water) with a radius of about 50 miles.  (10 CFR §§ 50.47(c)(2), 50.54(s)(1),(2);*id.*, Part 50, App. E, § I, fn. 1; 44 CFR § 350.7(b); cf., see also, *Emergency Planning*, *supra*, 45 Fed.Reg. at p. 55406.)  Of course, "the exact size and configuration the EPZ's for a particular nuclear power reactor is determined in relation to local emergency response needs and capabilities as they are affected by such [site specific] conditions as demography, topography, land characteristics, access routes, and jurisdictional boundaries."  (10 CFR, §§ 50.47(c)(2), 50.54(s)(1); see also *Emergency Planning*, *supra*.)

[15]"Full participation" when used in conjunction with emergency preparedness exercises for a particular site is defined to mean "appropriate offsite local and State authorities and licensee personnel physically and actively take part in testing their integrated capability to adequately assess and respond to an accident at a commercial nuclear power plant." (10 CFR, Pt. 50, App. E, § IV.F, fn. 4.)  It includes "testing the major observable portions of the onsite and offsite emergency plans and mobilization of State, local and licensee personnel and other resources in sufficient numbers to verify the capability to respond to the accident scenario."  (*Ibid.*)

The California Legislature has recognized the need to maintain such emergency preparedness in section 8610.5 and the Radiation Protection Act. We have seen how the former was prompted by the incident at the Three Mile Island facility and how enactment of the latter followed upon the incident at Chernobyl. After each incident the Legislature held hearings on the ability of State and local agencies to respond to an emergency at a nuclear powerplant, and then enacted the respective legislation to ensure the adequacy of that response. Thus, in both pieces of legislation the Legislature has required State and local agencies to actively participate in planning, training, and general nuclear powerplant emergency preparedness. And it has expressed its intention that the costs associated with that activity be borne by the utilities operating the nuclear facilities. (§ 8610.5, [1], [4], [5], [10], [11], *supra*.)

And so we return to the question of the effect the decommissioning of Rancho Seco will have on SMUD's obligation to reimburse its share of those costs under section 8610.5 and how the decommissioning will in turn affect the obligations of other utilities with nuclear powerplants in the State.

As we have interpreted section 8610.5, the obligation of a utility to contribute toward the reimbursement of State and local agency costs for nuclear powerplant emergency planning and preparedness under section 8610.5, was never meant to depend on whether its nuclear facility was actually producing electricity. Under the section, reimbursement is required whether or not a powerplant is actually producing electricity, as long as State and local agency emergency preparedness efforts are necessary because of it.

SMUD's current operating license for Rancho Seco continues to be predicated upon an assurance that an adequate and capable response can be made by State and local agencies to a foreseeable radiological emergency at the facility (cf., 10 CFR §§ 50.47(a),(b), 50.54(s)(3), & Pt. 50, App. E) and that requirement would ordinarily persist throughout the full term of the operating license for the facility. (Cf., *id.*, § 50.54(q).) Thus, although Rancho Seco is no longer producing electricity, the facility still occasions the need for state and local emergency planning and preparedness. Under our interpretation of section 8610.5, as long as that is the case, SMUD will remain liable to contribute its appropriate share to reimburse the cost of those efforts.

However, as the decommissioning of Rancho Seco progresses there will come a time when current emergency preparedness for the facility will no longer be necessary because the radiological hazard presented by the presence of nuclear material will be significantly reduced or removed. Thus, at some point in the decommissioning process SMUD will undoubtedly seek an amendment to

its operating license to modify or remove the need for continued State and local preparedness in connection with the plant, and if no safety question is presented, the NRC will grant SMUD's application. (Cf., 10 CFR §§ 50.91, 50.92; see also, NRC, <u>Statement of Consideration - General Requirements for Decommissioning Nuclear Facilities</u>, 53 Fed.Reg. 24018, 24019, 24025 (June 27, 1988).)

At this venture it is impossible to say with any certainty when the need for State and local emergency planning and preparedness in connection with Rancho Seco will no longer be necessary. A nuclear powerplant is not simply "unplugged" and decommissioning is a lengthy and variable process. It is defined as "remov[ing] ... a facility safely from service and reduc[ing] residual radioactivity to a level that permits release of the property for unrestricted use and termination of license." (10 CFR § 50.2.)[16] The ultimate aim is that the facility site can become available for unrestricted use for any public or private non-nuclear purpose. (<u>Statement of Consideration</u>, *supra*, 53 Fed.Reg. at pp. 24019, 24020.)

Decommissioning applies to the site, buildings and contents, and equipment associated with a nuclear facility that are or will become contaminated during the time the facility is licensed. (*Id.*, at p. 24021.) Decommissioning does not apply to the removal and disposal of spent fuel because that is considered to be an "operational" activity. (*Id.* at 24019.) As mentioned at the very outset, the spent fuel from Rancho Seco has not been removed from the site.

Decommissioning activities are initiated when a licensee decides to terminate licensed activities. (10 CFR § 50.82(a).) This must be done within two years following the permanent cessation of operations. (*Ibid.*) The application for termination must be accompanied (or preceded) by a proposed decommissioning plan that sets forth the choice of one of three alternatives for decommissioning the facility, together with a description of the activities that will be involved and the controls and procedures that will protect the public health and safety. (*id.*, subsec. (a),(b).)

---

[16]"`Unrestricted use' refers to the fact that from a radiological standpoint no hazards exist at the site, the license can be terminated and the site can be considered an unrestricted area. This definition is consistent with the definition of an unrestricted area [given] in 10 CFR 20.3 as being `any area access to which is not controlled by the licensee for purposes of protection of individuals from exposure to radiation and radioactive materials and any area used for residential quarters.'" (<u>Statement of Consideration</u>, *supra*, 53 Fed.Reg. at p. 24020.)

The alternatives for decommissioning are called DECON, SAFSTOR, and ENTOMB. All three provide ways in which residual radioactivity at a facility can be reduced to a level to permit release of the property for unrestricted use. They either involve a prompt dismantling of the facility or a storage period during which radioactive decay can occur prior to dismantlement.[17] (See Statement of Consideration, *supra*, 53 Fed.Reg. at p. 24020.)

Decommissioning can be a lengthy process. As mentioned, it is initiated when an application to terminate a license is filed with the NRC, but that may be many years before a utility's operating license is actually terminated. (*Id.* at p. 24024.) The length of time will certainly depend upon the decommissioning alternative chosen. A reasonable period for DECON is 5 to 10 years; SAFSTOR can take from 30 to 50 years; and ENTOMB may take up to 100 years.[18] (See Statement of Consideration, *supra*, 53 Fed.Reg. at p. 24023; but see, 10 CFR § 50.82(b)(1)(i),(iii) [60 year maximum unless necessary to protect the public health and safety].) The DECON and SAFSTOR alternatives are "reasonable options for decommissioning [a] light water power reactor[]", such as Rancho Seco. (*Ibid.*)[19] Each method has its advantages and disadvantages.

---

[17]"DECON is the alternative in which the equipment, structures, and portions of a facility and site containing radioactive contaminants are removed or decontaminated to a level that permits the property to be released for unrestricted use shortly after cessation of operations." (Statement of Consideration, *supra*, 53 Fed.Reg. at p. 24022.) "SAFSTOR is the alternative in which the nuclear facility is placed and maintained in a condition that allows the nuclear facility to be safely stored and subsequently decontaminated (deferred contamination) to levels that permit release for unrestricted use." (*Ibid.*) ENTOMB is the alternative "in which radioactive contaminants are encased in a structurally long-lived material, such as concrete; the entombed structure is appropriately maintained and continued surveillance is carried out until the radioactivity decays to a level permitting unrestricted release of the property." (*Id.* at p. 24023.)

[18]Decommissioning of the facility at Humboldt Bay commenced in 1984/86 and the decommissioning process is expected to be completed in the year 2015. (See Statement of Consideration, *supra*, 53 Fed.Reg. at p. 24028.) The facility is in the SAFSTOR mode. However, it should be noted that since permanent operations at that reactor ceased before July 27, 1988, the current decommissioning rules of the NRC do not apply. (10 CFR § 50.82(a); see also, Statement of Consideration, *supra*, 53 Fed.Reg. at p. 24027.)

[19]The longer ENTOMB alternative would be more appropriate for "smaller reactor facilities, reactors which do not run to the end of their lifetimes, or other situations where long-lived isotopes do not build up to significant levels, or where there are other

For example, DECON releases the site for unrestricted use in a much shorter time period than SAFSTOR, but the latter reduces occupational exposures and waste volumes.  (*Ibid.*)

The NRC will terminate a license after decommissioning has been completed, if it determines that it has been adequately performed in accordance with the decommissioning plan and the terminal radiation survey demonstrates that the facility and site are suitable for release for unrestricted use.  (10 CFR § 50.82(f).)  During the decommissioning process, however, the licensee still has the responsibility to protect the public health and safety, and any change from the original operating license requires Commission approval.  (See  Statement of Consideration , *supra*, 53 Fed.Reg. at p. 24024.)

As mentioned, at some point during the decommissioning of Rancho Seco, when the radiological hazard which now occasions the need for emergency preparedness no longer exists, SMUD will seek Commission approval to remove (or modify) the requirement for that preparedness to continue as a condition of its operating license. If it is then determined that State and local agency emergency planning and preparedness is no longer necessary in connection with the facility to assure the public health and safety, the NRC will grant SMUD's application.

Again, it is impossible to say at this time when that might be.  SMUD has not even filed an application with the Commission to terminate its operating license to start the decommissioning process, and it has not as yet set forth a decommissioning plan for the facility.  Thus it is not even known which of the alternative decommissioning plans SMUD will chose to follow.   But whatever path is chosen, and whenever it is undertaken, it will be the Nuclear Regulatory Commission, and not the Sacramento Municipal Utilities District, that will make the decision on the need for continued State and local emergency planning and preparedness in connection with Rancho Seco.[20]

_____

site specific factors affecting the safe decommissioning of the facility, as for example, presence of other nuclear facilities at the site for extended periods."  (See Statement of Consideration, *supra*, 53 Fed.Reg. at p. 24023.)

[20]It should be noted that under the Atomic Energy Act the federal government has preempted the regulation of the construction and operation of commercial nuclear power plants insofar as the aspect of radiological safety is concerned, and the NRC determination of radiological hazards preempts further state regulation.  (Cf., 42 U.S.C.A. § 2021(k);*Northern States Power Co.* v. *Minnesota* (8th Cir. 1971) 447 F.2d 1143, 1148, 1149-1150, 1154, aff'd., 405 U.S. 1035 [State of Minnesota may not impose a more stringent regulation of radioactive effluents to the environment

We are constrained to interpret section 8610.5 in light of its manifest purpose. (Cf., *Great Lake Properties, Inc* v. *City of El Segundo*, *supra*, 19 Cal.3d 152, 153; *People* v. *Shirokow* (1980) 26 Cal.3d 301, 306-307; *Moyer* v. *Workmen's Compensation Appeals Board*, *supra*, 10 Cal.3d 222, 230; *Select Base Materials* v. *Board of Equalization*, *supra*, 51 Cal.2d 640, 645.) That we have seen was to secure reimbursement of State and local costs for nuclear powerplant emergency preparedness, that were reimbursed by federal funds, from the operators of those facilities which occasion the need for that preparedness. Accordingly, we conclude that as long as State and local agency emergency preparedness continues to be required in connection with the Rancho Seco nuclear facility, the Sacramento Municipal Utility District will be liable for reimbursement of costs under section 8610.5. Conversely, when the NRC makes a decision that the State and local efforts to maintain emergency preparedness for Rancho Seco are no longer needed, SMUD will be relieved of its obligation to reimburse costs under the section.

As a corollary, we were asked about the effect the decommissioning of Rancho Seco will have on the contributions other utilities with nuclear powerplants make to reimburse state and local costs under section 8610.5. Under the present terms of the section (cf., fn. 5, *ante*), the total annual reimbursement of State agencies' costs for emergency preparedness (not reimbursed with federal funds, and capped at $937,000) is shared equally by "the utilities operating the nuclear powerplants within the State" (§ 8610.5, [8]), and those utilities are also responsible for reimbursing the preparedness costs of local agencies (not reimbursed with federal funds) in an amount equal to the lesser of either the actual annual costs or, for privately owned utilities $250,000 "per reactor unit annually", and for publicly owned utilities, $450,000 "per reactor unit annually" (*id.*, [9]).

Ever since section 8610.5 was adopted, it has distinguished between the reimbursement of State agency costs and the reimbursement of local agency costs for emergency preparedness activities. Thus, the section originally provided that State agency costs (capped at $2,000,000) were to be prorated among the operators of the powerplants upon an equitable method of assessment developed by the Public Utilities Commission and transmitted to OES. (§ 8610.5 as enacted by Stats. 1979, ch. 956, pp. 3297, 3298, § 1.) Local agency costs, on the other hand, were to be reimbursed on an individual basis by the operator of each powerplant that occasioned them. (*Ibid.* ["local agencies shall be reimbursed for

than that permitted by NRC]; see also, *Pac. Legal Found.* v. *State Energy Resources, etc.* (9th Cir. 1981) 659 F.2d 903, 921, cert. den. 457 U.S. 1133; *Northern Cal. Assn.* v. *Public Util. Com.* (1964) 61 Cal.2d 126, 133; *Carstens* v. *California Coastal Com.* (1986) 182 Cal.App.3d 277, 281, fn. 2.)

their costs incurred in preparing or updating their plans for the affected area surrounding such powerplants by the operator of each such powerplant."].)  In 1982 a limit was put on the reimbursement of local costs at "the lesser of the actual costs or ... $100,000 per reactor unit annually...."  (Stats. 1982, ch. 864, p. 3216, § 1.)  Although the limit has changed, this is similar to the language which appears in section 8610.5 today.  (§ 8610.5, [9].)  We see it as a continuing indication that the reimbursement of local agency preparedness costs is be particularized on a local basis.

        We have interpreted section 8610.5 as imposing the obligation to reimburse State and local agency costs for emergency planning and preparedness on those utilities whose nuclear facilities make those efforts necessary.  When such efforts are no longer necessary for Rancho Seco and SMUD is relieved of its obligation to reimburse costs under the section, the new State costs for emergency preparedness, now no longer including preparedness activities in connection with Rancho Seco, will become equally shared by the remaining two private utilities operating nuclear powerplants having a capacity of 50 megawatts or more in this State.  (§ 8610.5, [8]; cf., Appendix B.)  Those utilities will also continue to be responsible for reimbursing the local cost of emergency preparedness at their individual facilities, as they are at present.  (§ 8610.5, [9].)

***

APPENDIX A

Government Code Section 8610.5

     "The Office of Emergency Services, in consultation with the State Department of Health Services and affected counties, shall investigate the consequences of a serious nuclear powerplant accident for each of the four nuclear powerplants in California with a generating capacity of 50 megawatts or more.  This study, to be completed within six months of the effective date of this section, shall include the preparation of specific site maps showing the areas likely to be affected by such an accident.  These maps shall delineate Emergency Planning Zones, which shall reflect inhalation, ingestion, and other radiation pathways.  [¶] A similar study shall be made by the office for any subsequent nuclear powerplant with a generating capacity of 50 megawatts or more proposed for certification in California.

     "The Office of Emergency Services shall revise its Nuclear Power Plant Emergency Response Plan to reflect the information provided in the study.  The Office of Emergency Services shall assist local authorities in preparing or upgrading their emergency response plans to reflect its new planning guidelines.  The state

plan shall be updated within six months after the study has been made. Local plans shall be updated and approved by the Office of Emergency Services in accordance with the following: (1) an initial draft plan shall be submitted to the office within six months after the study has been made, and (2) a final plan shall be completed, reviewed, and approved within 18 months after the effective date of this section. Neither the state plan nor any local plan shall become effective or be implemented until approved by the Office of Emergency Services of this state or the Federal Emergency Management Agency. [¶] The current State Nuclear Power Plant Emergency Response Plan shall continue in full force and effect unless and until revised pursuant to this section. Local plans shall remain in full force and effect unless and until revised pursuant to this section.

"It is the intent of the Legislature that state and local costs related to carrying out the provisions of this section which are not reimbursed by federal funds shall be borne by the utility with existing nuclear powerplants having a generating capacity of 50 megawatts or more. The Public Utilities Commission shall develop and transmit to the Office of Emergency Services an equitable method of assessing the utilities operating the powerplants for their reasonable pro rata share of state agency costs. Each local agency involved shall submit a statement of its costs in such manner as the Office of Emergency Services shall require. Upon each utility's notification by the Office of Emergency Services, from time to time, of the amount of its share of the actual or anticipated state and local agency costs, the utility shall pay such pay such amount to the Controller for deposit in the Nuclear Planning Assessment Special Account, which is hereby created in the General Fund for use by the Controller, upon appropriation by the Legislature, to carry out this section, and, upon appropriation by the Legislature, to carry out the purposes of Chapter 6.99 (commencing with Section 25572 of Division 20 of the Health and Safety Code. The Controller shall pay from this account the state and local costs relative to carrying out the provisions of this section and Chapter 6.99 (commencing with Section 25572) of Division 20 of the Health and Safety Code, upon certification thereof by the Office of Emergency Services. Each utility operating a nuclear powerplant shall, within one month of the effective date of this section, pay to the Controller for deposit into the Nuclear Planning Assessment Special Account the sum of twenty-five thousand dollars ($25,000) for each nuclear powerplant for the purpose of funding initial planning costs. Upon repeal of this section, any amounts remaining in the special account shall be refunded pro rata to the utilities contributing thereto. Commencing on the effective date of the amendment of this section during the 1988 portion of the 1987-88 Regular Session of the Legislature, the total annual reimbursement of state costs from the utilities operating the nuclear powerplants within the state pursuant to this section shall not exceed the lesser of the actual costs or nine hundred thirty-seven thousand dollars ($937,000)

annually to be shared equally among the utilities.  Commencing on January 1, 1989, the total annual reimbursement of local costs from privately owned utilities shall not exceed the lesser of the actual costs or two hundred fifty thousand dollars ($250,000) per reactor unit annually and from publicly owned utilities shall not exceed the lesser of the actual costs or four hundred fifty thousand dollars ($450,000) per reactor unit annually.  Of the nine hundred thirty-seven thousand dollars ($937,000) for state costs, three hundred seventy-five thousand dollars ($375,000) are in support of an annual interagency agreement between the Office of Emergency Services and the State Department of Health Services for activities of the department pursuant to this section and Chapter 6.99 (commencing with Section 25572) of Division 20 of the Health and Safety Code, three hundred thousand dollars ($300,000) are in support of the Office of Emergency Services for activities pursuant to this section and two hundred sixty-two thousand dollars ($262,000) are in support of the Office of Emergency Services for activities pursuant to Chapter 6.99 (commencing with Section 25572) of Division 20 of the Health and Safety Code.  Of the two hundred fifty thousand dollars ($250,000) per reactor unit annually for local costs, paid by privately owned utilities, up to one hundred fifty thousand dollars ($150,000) per reactor unit are in support of activities pursuant to this section and up to one hundred thousand dollars ($100,000) per reactor unit are in support of local activities pursuant to Chapter 6.99 (commencing with Section 25572) of Division 20 of the Health and Safety Code.  The amounts paid by privately owned utilities under this section shall be allowed for ratemaking purposes by the Public Utilities Commission. Publicly owned public utilities may include amounts paid under this section in their rates.  [¶] The amounts specified in this section shall be adjusted each fiscal year by the percentage increase in the California Consumer Price Index for the previous calendar year.

"This section shall remain in effect only until January 1, 1994, and as of that date is repealed, unless a later enacted statute which is chaptered on or before January 1, 1994, deletes or extends that date."  (§ 8610.5; Stats. 1979, ch. 965, p. 3296, § 1 as amended by Stats. 1982, ch. 864, p. 3215, § 1, eff. Sept. 10, 1982; Stats. 1986, ch. 722, p. 2401, § 1; Stats. 1987, ch. 450, p. ___, § 1, eff. Sept. 8, 1987; Stats. 1988, ch. 1607, p. ___, § 1; emphases added.)

```
=================================================
```

## APPENDIX B

Commercial Nuclear Powerplants in California

| Site &<br>Reactor Units | Operating<br>License Issued | Utility Involved |
|---|---|---|
| Humbolt Bay | Aug.`62-pvnsl.<br>1969 -40 year | Pacific Gas & Electric |
| Rancho Seco | August 1974 | Sacto.Mun.Util.Dist.-SMUD |
| San Onofre | -- | So. California Edison |
| Unit #1 | March 1967 | |
| Unit #2 | August 1982 | |
| Unit #3 | September 1983 | |
| Diablo Canyon | -- | Pacific Gas & Electric |
| Unit #1 | April/Nov. 1984 | |
| Unit #2 | August 1985 | |

*****